# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 24-SW-408 |
| ONE DIGITAL DEVICE UNDER RULE 41 | ) |
| | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); 18 U.S.C. § 933 (Trafficking in Firearms); 18 U.S.C. 2250 (Failure to Register as a Sex Offender). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dean Kezman, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:    12/23/2024

_____
*Judge's signature*

City and state:    Washington, D.C.

G. Michael Harvey
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  24-SW-408 |
| ONE DIGITAL DEVICE UNDER RULE 41 | ) | |
| | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____January 06, 2025_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
                                                                          *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____12/23/2024_____          _____
                                                                                    *Judge's signature*

City and state:  _____Washington, D.C._____          _____G. Michael Harvey_____
                                                                          United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>24-SW-408 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

*Property to be searched*

The property to be searched is black Samsung cellular phone in clear case bearing IMEI# 355030765799943, hereinafter, the "TARGET DEVICE". The TARGET DEVICE is currently stored by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") as ATF Exhibit #004 at the ATF Washington Field Division, located at 90 K Street NE, Washington, DC, 20002.



**ATTACHMENT B**

*Property to be seized*

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to the commission of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm), 18 U.S.C. § 933 (Trafficking in Firearms), 18 U.S.C. 2250 (Failure to Register as a Sex Offender) by Gerald Evans (the "TARGET OFFENSES") as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

a. Establishing or documenting the commission of the TARGET OFFENSES;

b. Identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

c. Reflecting the ownership and use of the item identified in Attachment A;

d. Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

e. Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

f. Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g. Documenting the suspect's access to, purchase of, possession of, or relationship with, firearms, ammunition, or firearms accessories;

h. Containing photographs or videos that would constitute evidence of a violation of the TARGET OFFENSES, to include photographs or videos of firearms, ammunition;

i. Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of firearms in violation of the TARGET OFFENSES;

j. Relating to the state of mind of the suspects, *e.g.*, intent, absence of mistake, or evidence indicating preparation, planning, knowledge, or experience, related to the TARGET OFFENSES;

k. Any records and information relating to firearms purchasers and suppliers of firearms;

l. Records and information related to the email addresses, phone numbers, social media, account identifiers used by the suspects, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

m. Evidence of who used, owned, or controlled the TARGT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

n. Evidence of software, or the lack thereof, that would allow others to control each of the TARGET DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

o. Evidence of the attachment to the TARGET DEVICE of other storage devices or similar containers for electronic evidence;

p. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICE;

q. Evidence of the times the TARGET DEVICE were used;

r. Passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICE;

s. Documentation and manuals that may be necessary to access the TARGET DEVICE or to conduct a forensic examination of the TARGET DEVICE;

t. Records of or information about Internet Protocol addresses used by the TARGET DEVICE related to the TARGET OFFENSES; and

u. Records of or information about the TARGET DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search

2

engine, and records of user-typed web addresses related to the TARGET OFFENSES.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF** **ONE DIGITAL DEVICE UNDER RULE 41** | **No. 24-SW-408** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Dean Kezman of the Bureau of Alcohol, Tobacco, Firearms and Explosives, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I make this affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a search warrant authorizing the search of one cellular telephone seized on December 10, 2024, (the "TARGET DEVICE"), which is further described below and in Attachment A, for the things described in Attachment B.

2.      Your Affiant has been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives since December of 2023.   I am currently assigned to the ATF Washington Field Division's Group I High Intensity Drug Trafficking Area (HIDTA) Task Force. I am tasked with investigating individuals who are involved in narcotics and firearms trafficking, illegal possession and transfer of firearms, and violent crimes involving firearms.   I have participated in several controlled firearms and narcotics purchases, electronic surveillance operations, and investigations pertaining to narcotics trafficking.

3.      I have a Bachelor of Arts degree in Criminology from Virginia Polytechnic Institute and State University in Blacksburg, Virginia.   I have received formal training at the Federal Law Enforcement Training Center in Glynco, Georgia.   There, I successfully completed the twelve-week Criminal Investigator Training Program, which familiarized me with basic narcotics

1

investigations, drug identification, federal criminal law, financial investigations, money laundering, organized crime investigations, physical and electronic surveillance, mobile device investigations, and undercover operations. Additionally, I completed the fifteen-week ATF Special Agent Basic Training course in Glynco, Georgia, which included comprehensive, formalized instruction in firearms identification, firearms trafficking, arson and explosives identification and investigation, among other ATF-specific responsibilities.

4.      I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code. As an ATF Special Agent, I am authorized to execute warrants issued under the authority of the United States.

5.      Based on your affiant's training, experience, and participation in firearms-related investigations, and the training and experience of other law enforcement agents with whom I am working on this investigation, I know that:

      a.  It is common for individuals engaged in the unlawful trafficking and/or possession of firearms to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by showcasing the firearms that are in their possession, or coordinating the distribution of firearms, illegal proceeds therefrom, and other efforts of co-conspirators. It is also common for those individuals to utilize social media, to include Instagram, to further such criminal activities;

      b.  Individuals engaging in the unlawful trafficking and/or possession of firearms often use cellular telephones, cellular telephone technology, and social media (*i.e.*, Instagram) to

2

communicate about firearms to friends and followers and to remain in contact with customers or possessors of those firearms;

      c.   Individuals who engage in the unlawful trafficking and/or possession of firearms use cellular telephones and social media (Instagram) to exchange information with customers and/or sources of supply through text messaging and direct messaging in addition to direct telephone conversations.  It is also common for firearms traffickers/possessors to send photographs and videos as an exchange of information with customers and/or source(s) of supply;

      d.  Cellular telephones and social media accounts used by firearms traffickers/possessors often contain valuable information and evidence relating to their activities.  Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, direct messages, images and video, Global Positioning System data, and any other stored electronic data.  This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking; (ii) identify locations where traffickers traveled to before and after transporting or selling.

      6.     Because this affidavit is being submitted for the limited purpose of applying for a search warrant, I have not set forth every fact learned during this investigation.  I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other law enforcement officers, reports and data provided by other officers, which I have read and reviewed, and, in part, upon information and belief.

      7.     As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports and information submitted by involved Metropolitan Police

Department officers and other law enforcement officers, I am familiar with the aspects of this investigation.

8.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that EVANS and other individuals unknown to me at this time, including others who may have conspired with or aided and abetted EVANS, have committed violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm), 18 U.S.C. § 933 (Trafficking in Firearms), 18 U.S.C. § 2250 (Failure to Register as Sex Offender) (the "TARGET OFFENSES").   There is also probable cause to believe that a search of the TARGET DEVICE as described in Attachment A in the manner described in Attachment B will result in evidence of violations of the TARGET OFFENSES.

## PROBABLE CAUSE

9.    On December 10th, 2024, an officer with the Metro Transit Police Department (MTPD), working in a plain clothes capacity on bus 5476, witnessed a man, later identified as Gerald EVANS, fare evade onto the bus by walking past the fare card reader/box at the front of the bus and not paying the established WMATA fare.  At the next stop, located at the intersection of 4th St and H St NW, Washington, D.C., the MTPD officers stopped EVANS and identified themselves as police officers, attempting to give EVANS a D.C. Civil Citation.  During this interaction, the officers asked EVANS multiple times for his name, date of birth, and address. EVANS refused to provide identification and gave a fake name, and consequently was placed under arrest for fare evasion.

10.    During a search incident to EVANS' arrest, officers removed a "scabbard" that was slung around his body. When asked what it was, EVANS responded "that's my gun." After opening the scabbard, the officers found a loaded black Mossberg Shockwave (Serial Number:

4

V1284929, Model: 590 Shockwave, Caliber: 12) with one round in the chamber and three shotgun slugs in the magazine tube. After running the serial number of the firearm, it was revealed the firearm was reported stolen in Prince Georges County on April 30, 2024. Below are photographs of the firearm recovered from EVANS's person at the time of the incident.





11.    Also located on EVANS' person was a black Samsung cellular phone in clear case bearing IMEI # 355030765799943 ("TARGET DEVICE"), which is further described in Attachment A.

12.    When EVANS was processed for arrest, law enforcement determined his true name and a routine wanted check revealed the defendant had an open warrant through Anne Arundel County Sheriff's Office. On July 25, 2023, the Anne Arundel County District Court issued a

warrant for Gerald Evans for failing to appear for trial in Case No. D-07-CR-22-011379. The charge in that case alleges Theft greater than $1,500 and under $25,000.

13.     There are no firearm or ammunition manufacturers in the District of Columbia. Therefore, the firearm and ammunition described above necessarily traveled in interstate commerce before they were recovered in the District of Columbia.

14.     On September 22, 2015, EVANS was convicted of Fourth Degree Sex Offense and sentenced to 10 years of incarceration, with all 10 years suspended in Upper Marlboro, Maryland. On April 5, 2016, EVANS was convicted of Second Degree Assault and sentenced to a 10 year suspended sentence, which was later revoked to 18 months of incarceration in Prince George's County, Maryland case CT151122X. On February 7, 2014, EVANS was convicted of Attempted Armed Robbery and sentenced to an 8 month suspended sentence. As a convicted felon, EVANS would not be legally allowed to purchase a firearm from a federal firearms licensee. Therefore, any person who provided him with the firearm likely did so in an unauthorized fashion and without any belief that EVANS would have registered the firearm and complied with the firearms laws in Washington, D.C., therefore having reasonable cause to believe that the use, carrying, or possession of the firearm by EVANS would constitute a felony, in violation of 18 U.S.C. § 933. Similarly, EVANS, as a convicted felon, knew, or had reasonable cause to believe, that it would constitute a felony to possess the firearm, in violation of 18 U.S.C. § 933. Therefore, given the communications regarding the illegal purchase and sale of a firearm typically occur or are arranged via electronic communication, as discussed below, there is probable cause to believe that evidence of a violation of 18 U.S.C. § 933 will be found in the TARGET DEVICE.

15.     As a convicted sex offender, pursuant to the Sex Offender Registration and Notification Act ("SORNA") 34 U.S.C. § 20901 et seq, EVANS is required to register and update

his registration. Through my investigation, I am aware that EVANS last registered as a sex offender on February 16, 2018 and last verified his registration on January 15, 2019. He signed and acknowledged the notification was due at his next verification appointment at the Court Services and Offender Supervision Agency for the District of Columbia ("CSOSA") on January 15, 2020, however, he did not appear as required. EVANS also signed and acknowledged the Sex Offender Notification Form at the DC Department of Corrections upon his release on September 9, 2024. He was required to register within three days of his release. He failed to do so.

16.     I also know through my investigation that EVANS traveled interstate during the period where he was required to register as a sex offender. One such instance of interstate travel was in January 2024, where he bought a laser a pawn shop in Howard County, Maryland, and his list address as within the District of Columbia.

17.     On December 18, 2024, EVANS was indicted with one count of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) for the conduct that was the subject of his arrest on December 10, 2024. EVANS made his Initial Appearance in this Court on December 20, 2024.

## TARGET DEVICE

18.     The TARGET DEVICE described in Attachment A was recovered from EVANS upon his arrest on December 10, 2024 in Washington, D.C.

19.     TARGET DEVICE is a black Samsung cellphone recovered from EVANS.

## BACKGROUND ON CELLULAR DEVICES

20.     It is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from January 31, 2024, the Pew Research Center for Internet & Technology estimated that 97% of Americans owned at least one cellular phone, and that nine in ten of these American cellphone owners own a smartphone. *See* Mobile Fact Sheet,

https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Oct. 26, 2024).

21.    Based on my training and experience, your Affiant knows that people who possess firearms also like to take pictures of themselves with firearms to prove ownership or possession of a particular firearm to their friends.  They will use, for example, a cell phone with a camera to photograph and store photographs of firearms or themselves holding the firearm and other criminal activity that they may be involved in.  Moreover, cellphones can contain communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase with accompanying price information.  Indeed, in this case, EVANS was barred from legally purchasing a firearm due to his prior felony conviction.  Therefore, he would have had to communicate with someone he knows to purchase firearms illegally.  Such communications are typically done by chat or text.

22.    Your affiant knows that cellular telephones contain valuable information and evidence relating to the TARGET OFFENSES.  Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data.  This information can: (i) reflect the preparation for, arrangement of, and commission of the TARGET OFFENSES; (ii) identify locations relevant to the TARGET OFFENSES; (iii) reflect the ownership and use of the cellular telephones by persons involved in the commission of the TARGET OFFENSES; (iv) document meetings and communications between associates, and co-conspirators of the TARGET OFFENSES; (v) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband relating to the TARGET OFFENSES; and (viii) document or contain evidence of the purchase of items or the assets derived from the TARGET OFFENSES.

23.     There is probable cause that further evidence of the TARGET OFFENSES will be found following a forensic search of the TARGET DEVICE. In summation, and as further explained below, the execution of a search warrant on the TARGET DEVICE would allow law enforcement to, among other things, locate communications between the subjects and co-conspirators, collaborators, and facilitators of the commission of the TARGET OFFENSES, obtain evidence showing the locations of the TARGET DEVICE before, during, and after the TARGET OFFENSES, and recover information revealing ownership information of the TARGET DEVICE. Information from, for example, social media, chat services, and email accounts that are stored on the device are equally likely to contain evidence of the TARGET OFFENSES.

24.     All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES.

### **TECHNICAL TERMS**

25.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

     a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

          i.     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent

information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

ii.    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, DVDs, USB flash drives, flash memory cards, and internal and external hard drives.

iii.    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of

digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "Wi-Fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, email, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing GPS locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "Wi-Fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and they may contain records of the addresses or

locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.  "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

    f.  "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

    g.  Internet Protocol (IP) Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to

the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   h. The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   i. "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line (DSL), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a username or screen name, an email address, an email mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

   j. A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

   k. A "router" often serves as a wireless Internet access point for a single or

multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the

14

user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

> i. When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

> ii. Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

o. "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted

and usually cannot be intercepted by law enforcement.

        p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

        q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

        26.     Based on my training, experience, and research, I know that the TARGET DEVICE is a smartphone running the Android operating system.  In addition to functioning as a cellular telephone that can send and receive telephone calls and text (i.e., SMS) messages, the TARGET DEVICE has capabilities that allow it to serve as a digital camera, portable media player, GPS navigation device, and email communications device.  The TARGET DEVICE has a web browser, allows users to send "advanced messages" by which large files can be sent, and allows users to access and post to social media, such as Facebook and Instagram, via apps.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication

who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

27.    As described above and in Attachment B, this application seeks permission to search for fruits, evidence, information relating to, contraband, or instrumentalities of the TARGET OFFENSES that might be found within the TARGET DEVICE, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the things described in Attachment B will be found on the TARGET DEVICE, the item described above and in Attachment A, for at least the following reasons:

a.    Based on my training and experience, I know that people who possess firearms and other contraband like to take pictures of themselves with such items to prove ownership or possession to their friends—sometimes called "trophy photos."  They will use a camera, cellphone with a camera, tablets with a camera and or personal computers to photograph and store photograph of firearms or themselves holding the firearms or otherwise engaging in criminal activity that they may be involved in.  They also often share these images or video recordings with associates using text messaging or other forms of communication on their cellphone such as chat features or video and photo sharing on online social networking services, such as Instagram. These photographs, videos, and electronic communications are excellent evidence of illegal gun possession.  Moreover, cellphone apps such as Instagram can be used for communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.  As discussed above, there is probable cause to believe that

EVANS acquired the recovered firearm unlawfully, meaning he would have to purchase the firearm from or through someone he knows, which is typically done by phone.

        b.      Smartphones used by possessors of illegal firearms, like cellphones, contain valuable information and evidence relating to their possession of those firearms. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, GPS data, and any other stored electronic data. This information can, among other things: (i) reflect the preparation for, arrangement of, and commission of the trafficking of guns ; (ii) identify locations where individuals traveled to before and after acquiring, transporting, or selling guns; (iii) identify potential suppliers, customers, and distributors of guns; (iv) identify meeting locations for potential gun transactions; AND (v) document or contain evidence of the obtaining, secreting, transfer, expenditure, and/or concealment of guns.

        c.      Individuals who engage in criminal activity, including firearms trafficking offenses, use smartphones to access websites to facilitate illegal activity and to communicate with co-conspirators and others about their criminal activity online; to store on digital devices documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators and others; email correspondence; text or other messages; and contact information of co-conspirators and others, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts.

        d.      Individuals who fail to register under SORNA will often receive phone calls or messages from their probation officer, including regarding their obligation to register.

        e.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing

paragraph, which would be valuable in facilitating their criminal activity.

          f.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smartphone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smartphone, or other digital device habits.

        28.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when.

Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the TARGET DEVICE at issue here because:

g.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device is, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the device, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, email programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smartphone, or other digital device was in use.  Computer, smartphone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user

of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and it also can require substantial time.

h.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

i.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

j.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

k.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is

not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

29.    Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to

conducting a complete and accurate analysis of data stored on digital devices.

        c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

        d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format (PDF), do not lend themselves to keyword searches. Some applications for computers, smartphones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic

examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

     e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smartphones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cellphones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smartphones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated

AES-256 encryption for all data stored within the database in the mobile device.

> f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

30.    In searching for information, records, or evidence, as further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

> l.    Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICE to an appropriate law enforcement laboratory or similar facility for review.  The TARGET DEVICE, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

> m.    The analysis of the contents of the TARGET DEVICE may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a

drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

n.     In searching the TARGET DEVICE, the forensic examiners may examine as much of the contents of the TARGET DEVICE as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the TARGET DEVICE will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH THE TARGET DEVICES AT ANY TIME OF THE DAY OR NIGHT

31.     Because the TARGET DEVICE is in the custody of law enforcement and forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search of the TARGET DEVICE at any time of the day or night.

## CONCLUSION

32.     Your affiant respectfully submits that this affidavit supports probable cause for a warrant to search the TARGET DEVICE, the item in law enforcement possession as described in Attachment A, for fruits, evidence, information relating to, contraband, or instrumentalities of the

TARGET OFFENSES, the things described in Attachment B.

33.    Your affiant respectfully requests that this Court issue the proposed search warrant

pursuant to Federal Rule of Criminal Procedure 41.

_____
Special Agent Dean Kezman
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn by telephone pursuant to Federal Rules of Criminal Procedure 4.1
and 41(d)(3) by telephone on December 23, 2024.


_____
THE HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE